**In re NORTH AMERICAN DEALER GROUP, INC., a/k/a North American Dealers Services, Inc., Debtor.**

**Daniel McCOLLEY, Trustee of North American Dealer Group, Inc., a/k/a North American Dealers Services, Inc., Plaintiff,**

**v.**

**George JACOBS, Defendant.**

**Bankruptcy No. 180–07958–260.
Adv. No. 183–0193.**

United States Bankruptcy Court,
E.D. New York.

June 18, 1986.

John L. Mcncrief, New York City, for George Jacobs.

Stroock & Stroock & Lavan by Naomi Siegel, New York City, for trustee.

### DECISION AND ORDER

CONRAD B. DUBERSTEIN, Chief Judge.

This is an adversary proceeding commenced by the Chapter 7 Trustee in bankruptcy of North American Dealer Group ("NADS" or the "debtor"), to recover a fraudulent conveyance pursuant to Section 548 of the Bankruptcy Code from George Jacobs ("Jacobs"), the former President and fifty percent stockholder of NADS.[1]

### FACTS

NADS originally filed a petition for relief under Chapter 11 of the Bankruptcy Code. According to the schedules filed with this court at that time NADS had assets valued at approximately $2 million, secured debts of approximately $1 million and unsecured obligations of approximately $25 million. The case was subsequently converted to Chapter 7 and after an interim trustee was appointed, Daniel McColley, the plaintiff in this proceeding, was elected permanent trustee. After this fraudulent conveyance action was commenced by the trustee against Jacobs, discovery was completed under the Federal Rules of Civil Procedure and the Bankruptcy Rules, and the action ultimately tried.

NADS had been engaged in selling extended automobile service plans over and above the manufacturer's warranty to car dealers. The dealers in turn sold the plan to car buyers. The dealer then assigned each service plan to NADS as administrator of the plan.

Jacobs was president, Chief of Sales and fifty percent stockholder of the corporation. The remaining fifty percent of NADS was owned by Jacobs' partner, Howard Bass ("Bass"). NADS' main office was located in New Jersey. It was run by Bass who was responsible for the day to day operations of the business, including making disbursements, bookkeeping and general administration.

All sales operations were conducted through NADS' office in Palm Springs, California. From that office Jacobs directed the sales of the service contracts to car dealers throughout the United States. Proceeds from sales of service contracts were remitted to the debtor's main office in New Jersey. Funds for the California operations (salaries, office rent, sales expenses, etc.) were remitted to a bank account in California and drawn upon as needed by Jacobs, who was paid a yearly salary of $250,000.

The trustee testified that at the time of his election, he received only a few books and records of NADS, and those which he did get were in very poor condition. He also testified that he has never been able to locate the books and records usually kept at the California office.

Jacobs testified that in late 1979 he perceived that company funds were being paid out for improper purposes. Accordingly, he travelled to the New Jersey office to demand greater control over expenditures, including a daily accounting. Upon his return to California Jacobs claims that Bass responded to his demands by calling him and advising him that he was halting all payments to the California office including Jacobs' salary, and by demanding that Jacobs leave the company. From November of 1979 to May of 1980, Jacobs asserts that although he devoted his time to the performance of his duties on behalf of the debtor, he received no salary. He states that he was involved in negotiations with respect to who would take over NADS. He maintains that he negotiated with a number of insurance companies and was under

---

1. Section 548 of the Bankruptcy Code provides in pertinent part:

    Fraudulent transfers and obligations.
    (a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
    (2) (A) received less than a reasonably equivalent value in exchange for such transfer or obligation. . . .

the impression that an insurance company was attempting to buy him out.

He also testified that the insurance companies threatened to pull out as underwriters unless he withdrew from the company. Since he perceived that such action alone could have brought down the company, Jacobs claims that he had no choice but to make the best deal he could and depart. Jacobs stated that a condition of any agreement was that he receive the salary which had been withheld after the November cutoff. Tr. of 1/16/86 at 22.

Jacobs maintains that his dispute was resolved in four arms-length agreements: a Release signed by Jacobs and by Bass on behalf of NADS, the Resignation of Jacobs, an Agreement between Jacobs and NADS and an Agreement between Jacobs and Proprietors Insurance. All were executed on May 10, 1980.

In the Release Jacobs released "any and all rights he ever had, now has or in the future may have to any shares of stock, options to purchase stock, equity, assets or other item of value issued by or belonging to [NADS]."

The Release provided that in consideration of Jacobs' release of his interest in the corporation, NADS would:

(A) pay to Jacobs $125,000 with $25,000 to be paid on the signing of the Release and $4,000 to be paid per week beginning May 23, 1980 until the balance was fully paid;

(B) assign to Jacobs the balance of $16,493.03 in a checking account;

(C) release any rights it had to property identified as 611 Dry Falls Road, Palm Springs, California;

(D) forego repayment of up to $300,000 which was recorded in NADS' books as a loan to Jacobs;

(E) transfer two automobiles to Jacobs; and

(F) approve for payment a check payable to Jacobs in the amount of $3,300 which had previously been stopped by NADS.

The Release also provided that Jacobs transfer five office condominiums to NADS.

Of the $125,000 provided for in the Release, Jacobs received $105,000 between May 10, 1980 and the end of September 1980. In addition, he received the balance of $16,493.03 ((B) above), NADS' rights to the Plam Springs property ((C) above), and the two automobiles ((E) above). All transfers made to Jacobs pursuant to the Release were made out of NADS' assets and took place on or about May 10, 1980. In addition, insofar as the repayment of $300,000 is concerned (see (D) above), not only did Jacobs testify that he was not indebted to the debtor for any amount, it was further established that the debtor never proceeded against him for repayment. It was also established during the trial that the check for $3,200 (see (F) above) which had previously been stopped by the debtor was ultimately honored. He further testified that the check represented one week's salary which he had earned prior to the November cut-off.

Jacobs also resigned as an officer and director of NADS, and as of May 10, 1980 ceased to act in any capacity for the corporation. The court notes that his claim for salary covered the period up to that time. Shortly after May 10, 1980 NADS was taken over by Proprietors Insurance Company which had formerly been one of its underwriters and was a creditor of NADS for $10 million.

The first cause of action in the trustee's original complaint sought to recover $80,000 in cash paid to Jacobs by NADS. However, both in answer to interrogatories and in testimony Jacobs stated that he received $105,000. Accordingly, on the last day of the trial, the trustee's attorney made an oral motion to amend the pleadings to conform to the proof at trial pursuant to Fed. R.Civ.Pro. 15(b). At that hearing the trustee's attorney stated that the trustee sought only to recover the $105,000, the cash actually received by Jacobs from NADS. Jacobs opposed the motion to amend on the ground of laches and also on the ground

that the trustee was endeavoring to assert a new cause of action. The trustee further argued, both on the final date of the trial as well as in his Post-Trial Memorandum, that in order for the court to determine whether NADS had received "reasonably equivalent value" from Jacobs within the confines of Section 548 of the Bankruptcy Code, it must consider all of the transfers to Jacobs, including the $105,000, which the trustee maintained are valued in excess of $455,000.

Originally, the trustee had asserted a second cause of action in which he sought to recover as fraudulent, payments totalling $11,288.69 made by NADS to Jacobs allegedly for personal expenses. However, during the course of the trial the trustee conceded that the proof adduced did not establish this cause of action. Tr. of 1/16/86 at 4. Oddly enough, and not withstanding the concession, in his Post-Trial Memorandum the trustee argued that the relief requested in his second cause of action be granted.

Jacobs also asserts a counterclaim for $20,000 emanating from a default in installment payments due him under the Release.

Finally, Jacobs argues that this adversary proceeding is barred by the statute of limitations. His position is that the statute began to run after the appointment of the interim trustee. Therefore, he concludes that the trustee did not bring the action within the two-year period and it must be dismissed. It is the trustee's contention that the appointment of the permanent trustee triggers the running of the Section 546 statute of limitations.[2]

## DISCUSSION

■ Jacobs argues that the trustee's case is time barred because it was not brought within two years after the appointment of the *interim* trustee. A review of the relevant case law, however, indicates

that it is the appointment of the permanent trustee which triggers the Section 546 statute of limitations. *In re Outlet Dept. Stores, Inc.,* 49 B.R. 536 (Bkrtcy.S.D.N.Y. 1985); *In re Sin-Ko, Inc.,* 48 B.R. 180 (Bkrtcy.N.D.Ohio 1985); *In re Black & Geddes, Inc.,* 35 B.R. 827 (Bkrtcy.S.D.N.Y. 1983); *In re Killian Const. Co., Inc.,* 24 B.R. 848 (Bkrtcy.D.Idaho 1982).

The bankruptcy court in *Black & Geddes, Inc., supra,* succinctly explained the reason for the statute of limitations running from the appointment of the permanent rather than the interim trustee as follows:

That it is the appointment of the permanent trustee that is the operative date is reasonable in light of the caretaker nature of the interim trustee's position. The interim trustee is to preserve the estate until a trustee can be selected. This interim role is not intended to require the detailed array of professional assistance and investigation that a trustee's position requires.

35 B.R. at 829.

Although the interim trustee was appointed on February 12, 1981, Daniel McColley was elected permanent trustee of NADS on April 21, 1981. This fraudulent conveyance action was commenced on April 19, 1983. Clearly the action was commenced within two years of the appointment of the permanent trustee and thus, is not time barred.

As has been noted above, on the final day of trial, the trustee moved to amend the complaint to conform to the evidence pursuant to Fed.R.Civ.Pro. 15(b), made applicable to this case by the Bankruptcy Rules. That Rule provides:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the

---

**2.** Section 546 of the Bankruptcy Code provides in pertinent part:

(a) An action or proceeding under section . . . 548 . . . of this title may not be commenced after the earlier of—

(i) two years after the appointment of a trustee under section 702 . . . of this title; or

(2) the time the case is closed or dismissed.

pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits.

Granting leave to amend is in keeping with the general policy of the Federal Rules of Civil Procedure that controversies should be decided on their merits and not on procedural technicalities. *See Foman v. Davis*, 371 U.S. 178, 181–82, 83 S.Ct. 227, 229–30, 9 L.Ed.2d 222 (1962). The purpose of a complaint is to give fair notice of the claim asserted to enable the adverse party to prepare for trial by showing the type of case being commenced against it. This allows it to adequately prepare a defense to the allegations pleaded in the complaint. 2A *Moore's Federal Practice*, Para. 8.13 at 8–61 (2d ed.1985).

■ The original complaint contained two causes of action, the first for $80,000 and the second for $11,288.69. Apparently, the trustee first learned of the additional transfers of cash and property to Jacobs, as well as the existence of the Release and three other documents, in answers to interrogatories. During the course of the trial, the trustee's counsel stated that the first cause of action was limited to a demand for the recovery of the cash paid to Jacobs under the Release, i.e., $80,000 alleged in the complaint plus an additional $25,000 as disclosed in answer to interrogatories and recited in the Release. Any other claim was specifically disclaimed as follows:

THE COURT: [I] notice that ... in the pretrial memorandum reference is made to a host of alleged transactions which you are now touching upon, for which the trustee makes no claim. For example: the Release was conditioned upon NADS' assigning to Mr. Jacobs the balance of something in excess of $16,000 in the San Diego Bank. What happened to that?

ATTORNEY FOR TRUSTEE: We assume it was transferred to Mr. Jacobs. If I could explain, we are not seeking to recover it.

THE COURT: Nor are you seeking to recover anything with respect to the Palm Springs property, 611 Dry Falls Road. Is that your residence?

MR. JACOBS: That is correct.

THE COURT: That is not part of the lawsuit?

ATTORNEY FOR TRUSTEE: Just seeking back cash.... I am not seeking to recover the automobiles ...

THE COURT: Nor the $3,200.

ATTORNEY FOR TRUSTEE: No.

THE COURT: [t]hat ... NADS had agreed to pay to Mr. Jacobs, the check that previously was stopped, that's referred to? Nor are you seeking to recover, as he just now pointed out, or seeking to pursue the replacement of the sum of up to $300,000, which ... I note Mr. Jacobs says ... never was received". So that leaves us with just what the complaint says. I am permitting you to amend the first claim from $80,000 to $105,000 subject to, I am going to hold that in abeyance to be decided at a said future time. That's what it boils down to.

So we are talking about $105,000 plus $11,000 the thrust of which is that Mr. Jacobs received this money which he undoubtedly will not dispute.

But, it is your argument he didn't meet the fair consideration test of the Fraudulent Conveyance Act, Section 548, and that the company was insolvent at the time?

ATTORNEY FOR TRUSTEE: Even though we are not claiming back the other consideration listed in the Release the totality of the consideration given by

NADS to Mr. Jacobs for the Release must be considered even though the only actual payment that we knew about at the time of the complaint was the $80,000 So that is the actual cash amounts ...

\* \* \* \* \* \*

THE COURT: Have you given any consideration that a portion of this may have been backed by consideration?

\* \* \* \* \* \*

THE COURT: Also, I am putting in my mind we are not getting involved in any other transactions that are referred to peripherally in the memorandum of law. ATTORNEY FOR TRUSTEE: The only reasons the transactions are important is that they are part of the whole consideration, included in which is ... the Release. Even though we are only claiming $80,-000 that to consider what fair consideration was.

Tr. of 1/16/86 at 43–47.

A clear reading of the complaint as originally filed, together with the oral motion made at trial seeking to amend that complaint to conform to the evidence, indicates that the trustee seeks recovery of $105,000. However, the Post-Trial Memorandum seeks to expand even that relief to the recovery of the value of all of the items covered by the Release, an amount alleged to be $455,000, inclusive of the $105,000. The sum of $455,000 was never an issue in this proceeding. Nowhere in the original complaint nor in the request for amendment were any facts set forth in support of such relief. The trial centered on whether or not Jacobs gave value to NADS for the $105,000 that he received. Furthermore, no evidence was introduced during the course of the trial which would justify a recovery of $455,000.

There was virtually no testimony or other evidence presented by the trustee with regard to the nature and value of the transfers made to Jacobs, other than the $105,-000. The other items were only referred to obliquely.

The trustee spoke of $105,000 as far back as his Pre-Trial Memorandum. It was

the amount stated on the record. Jacobs certainly had notice that the amount requested as relief was $105,000 and not $80,000. We, therefore, allow amendment of the complaint only to the extent of reflecting that $105,000 is the amount requested. The amendment shall relate back to the date of the original complaint. Fed. R.Civ.Pro. 15(c).

Additionally, in his Post-Trial Memorandum the trustee argues that he has proven his second cause of action for $11,288.69 as personal expenses allegedly fraudulently transferred to Jacobs. However, as already has been pointed out, at the last day of the trial counsel for the trustee withdrew the second cause of action on the record:

THE COURT: ... The complaint also seeks the recovery by way of a second cause of action of $11,288.69 alleged to be various expenses which the defendant is charged with having received ... personal expenses for which there is no consideration ...

ATTORNEY FOR TRUSTEE: Yes, Your Honor. At this time we feel that proof does not come up to establishing that second claim.

Tr. of 1/16/86 at 42–43.

That cause of action was never pursued after that statement. We, therefore, dismiss that cause of action.

■ We turn now to the merits of this proceeding. Based upon the amended complaint, testimony and the evidence submitted at trial, the issue, as this court views it, is whether Jacobs provided NADS with "reasonably equivalent value" within the confines of Section 548 of the Bankruptcy Code for the payment of $105,000 to him. It is the trustee who is charged with the burden of proof regarding each of the elements involved in a fraudulent conveyance action. Collier's explains this as follows:

In an action by a bankruptcy trustee to set aside a conveyance under section 548, the burden of proof (risk of non-persuasion) that the conveyance was made un-

der the conditions that bring it within section 548 and hence is fraudulent, rests on the trustee. This burden of proof never shifts. "But while the burden of proof does not shift, yet during the progress of the suit the burden of going forward with the evidence to rebut a *prima facie* case may shift." [*In re Locust Bldg. Co.*, 299 F. 756, 763 (2d Cir.), *cert. denied sub nom. Keighley v. American Trust Co.*, 265 U.S. 590, [44 S.Ct. 635, 68 L.Ed.2d 1195] (1924). *See also Chorost v. Grand Rapids Factory Showrooms, Inc.*, 77 F.Supp. 276 (D.N.J. 1948), *aff'd.* 172 F.2d 327 (3d Cir.1949)]. 4 *Collier's on Bankruptcy*, para. 548.10 at 548—111 to 112 (15th ed.1985).

Section 548(a)(2) provides a standard of constructive fraud which enables the trustee to avoid any transfer in which the debtor "received less than a reasonably equivalent value in exchange for such transfer" and "was insolvent on the date [of that transfer] or became insolvent as a result of such transfer." "Fairness of consideration is generally a question of fact." *Klein v. Tabatchnick*, 610 F.2d 1043, 1047 (2d Cir. 1979).

> Collier's expands upon this as follows: Whether value has been given for a transfer depends on all the circumstances of the case. Thus, whether a release of rights under a contract or the surrender of a lease is made for value must depend upon whether a good bargain is being given up or a burdensome obligation is being discharged. Whether the transfer is for "reasonably equivalent value" in every case is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts. When the consideration is difficult to measure precisely, the courts have not been too exacting in applying the criterion of "fair" consideration. (Citations omitted).

4 *Collier's on Bankruptcy*, para. 548.09 at 548–100 (15th ed.1985).

The trustee bases his request for relief on the lack of "reasonably equivalent value" allegedly received by NADS. The thrust of his arguments is that NADS received nothing in exchange for the $105,000 transferred to Jacobs since (1) the stock Jacobs transferred to NADS was stock of an insolvent company and was, therefore, worthless, (2) the Release of an interest in that corporation is similarly worthless and (3) the office condominiums which Jacobs transferred to NADS were not owned by Jacobs. Plaintiff's Pre-Trial Memorandum at 8–9.

Jacobs argues that he gave NADS "reasonably equivalent value" by performing work for the corporation for which he was not compensated. Testimony was elicited from Jacobs to support this contention. We do not find evidence to warrant a finding that the entire transaction was merely a redemption of stock by an insolvent corporation. Jacobs testified to the services he rendered to NADS during the six-month period in which his wages were withheld. He stated that he directed NADS' nationwide force of sixty to seventy sales people which as of May 10, 1980, was selling approximately 11,000 to 12,000 service contracts a month at a price of $450 to $500 a plan. He believed it was in his interest to do so since during that period of negotiations he contemplated taking over the business. Tr. of 1/16/86 at 17. He also believed that it was important to uphold NADS' integrity and reputation with the dealers, the salesmen and the policy holders. Consequently, during the six-month period in question he worked five to seven days per week to keep the California office operating and was in daily telephone contact with his salesmen and the many dealerships across the country. *Id.* at 11–12. Thus, he kept the salesmen from leaving NADS and joining another company. At one point policy holders' claims were not being honored by one of the insurance companies because the claimants did not know the underlying insurance policy numbers. *Id.* at 5. Jacobs contends that he assisted the claimants by obtaining the numbers.

In addition to providing his services to NADS, Jacobs maintains that he gave valuable consideration to NADS by signing the

Release which was in fact the settlement of a corporate power struggle and possible litigation that had value to all parties involved, by the transfer of office condominiums to NADS, and by forebearing from engaging in a competing business during the November, 1979 through May, 1980 period. Jacobs had formed Republic Warranty Corporation ("Republic") while he was still with NADS. However, the business of Republic was to be the sale of appliance service contracts. Ultimately, after his departure from NADS, Jacobs used Republic to start up an automobile service contract business. Tr. of 1/16/86 at 20. Jacobs' position is that although he could easily have used his sales force and contacts for himself, he did not compete with NADS during that period in question. Jacobs contends that his forebearance alone may have been worth millions to NADS, and should therefore be considered as valuable consideration.

We find Jacobs' testimony credible and entirely consistent with his position, that he expected to take over the company himself. We also find credible Jacobs' testimony that he demanded his salary on a number of occasions during the six-month cut-off and was told that it would be part of the final deal worked out. Tr. of 1/16/86 at 22. Jacobs testified that his salary at the time of the cut-off of the California office was $250,000 per year. Tr. of 1/16/86 at 5. The $125,000 provided for in the Release was one-half of that amount, which Jacobs urges is in itself evidence that his salary had been wrongfully withheld. It is to be noted that Jacobs actually received $105,-000 of that amount. *Id.* at 29. The $3,200 check which had previously bounced, but was approved for payment in the Release, was one week's net salary, also evidence of wrongfully withheld salary. *Id.* at 9.[3]

We find that the trustee presented no evidence to contradict Jacobs' testimony regarding the work he performed for NADS, or to warrant a finding that he was paid his wages from November, 1979—May, 1980 or was in fact working for Republic during that time. The trustee did submit a copy of NADS' Wage Report allegedly filed with the State of California indicating wages purportedly paid and taxes withheld. It showed that Jacobs received $43,750 for the quarter January 1—March 31, 1980. Plaintiff's Exh. 5; Tr. of 1/16/86 at 9–10. Jacobs denied receiving that money. No cancelled checks were offered into evidence nor was a witness called to rebut Jacobs' claim. There was no testimony as to the accuracy of the report or as to who prepared it. The court is not inclined to accept as a fact that Jacobs did receive such wages.

The trustee also submitted a Financial Statement of Republic showing an operating loss of $412,796 for the year ending December 31, 1980. Defendant's Exh. 13. Based upon that Statement, the trustee concludes that Jacobs was working for Republic and not NADS from March—May 1980 and, therefore would not be entitled to salary from NADS for that period, if he was entitled to any salary at all. Plaintiff's Post-Trial Memorandum at 15. Jacobs explained that Republic's operating loss was only done for "tax purposes". Tr. of 1/16/86 at 36. No witness or other evidence was submitted to rebut or contradict that statement. We find that neither the Wage Report nor the Financial Statement provide a sufficient amount of evidence to warrant a finding that Jacobs actually received $43,750 in wages or that his services were for Republic.

As noted earlier, there was virtually no evidence presented by the trustee with regard to the nature and value of the transfers enumerated in the Release and made to Jacobs, other than the $105,000. After considering all of the testimony and viewing the evidence, this court finds that Jacobs' receipt of $105,000 was supported by "reasonably equivalent value" in the form of services he rendered to NADS. This

3. Although the Release did not specifically refer to the $125,000 as representing unpaid salary, the facts which were developed during the trial support a finding that it represented one-half of Jacobs' salary of $250,000.

finding precludes any recovery by NADS of the $105,000 pursuant to the first cause of action as amended.

The finding of "reasonably equivalent value" obviates the need to consider any of the other issues raised by the parties.

There is no basis or justification for the counterclaim. The counterclaim is dismissed.

SO ORDERED.